UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICARDO HERNANDEZ, <br><br> Petitioner, <br><br> v. <br><br> D. RUNNELS, Warden, <br><br> Respondent. <br> _____ / | No. C 03-04267 SBA <br><br> **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

## INTRODUCTION

This matter is now before the Court for consideration of Petitioner Ricardo Hernandez's petition for a writ of habeas corpus concerning his 1999 convictions in Santa Clara County Superior Court. Warden D. Runnels (hereinafter "Respondent") opposed the petition. Petitioner filed a traverse. The Court DENIES the petition for a writ of habeas corpus.

## BACKGROUND

### A. Procedural History

Petitioner was charged with a six count information. The first five counts arose from events occurring on the night of September 19, 1998. The first count alleged murder in violation of Penal Code section 187 against Wally Martinez with the further allegation that Petitioner personally used a knife pursuant to Penal Code section 12022(b)(1). The second and third counts alleged attempted murder by Petitioner in violation of Penal Code section 664(a)/187 against George Molina and Arthur Martinez, with further allegations of personally using a knife in violation of 12022(b)(1) and personally inflicting great bodily injury in violation of sections 12022.7(a) and 1203(e)(3). The fourth and fifth counts charged Petitioner with assault with a deadly weapon in violation of Penal

Code section 245(a)(1) upon George Molina and Arthur Martinez, further alleging personal use of a knife and infliction of great bodily injury as above. The sixth count arose out of an assault that took place on October 31, 1997. The sixth count also charged Petitioner with assault with a deadly weapon in violation of Penal Code section 245(a)(1) upon Ricky Garcia.

Petitioner pleaded not guilty. A jury trial commenced on July 26, 1999. On August 11, 1999, the jury returned verdicts of guilty on all three counts of assault with a deadly weapon, though the jury found that the heightening circumstances were not present. The jury also found Petitioner guilty of second degree murder. The Honorable James H. Chang sentenced Petitioner to 20 years to life in state prison.

On July 10, 2002 the California Court of Appeal affirmed Petitioner's conviction. On August 12, 2002, Petitioner filed a petition for review in the California Supreme Court, which they denied on October18, 2002. On September 19, 2003, Petitioner filed the instant petition for a writ of habeas corpus. Respondent filed an Answer on February 9, 2005. Petitioner filed a Traverse on March 14, 2005.

**B.   Facts**

The following facts are drawn from the California Court of Appeal's July 10, 2002 opinion affirming the judgment of the trial court.[1] The facts surrounding the assault of October 31, 1997 are omitted because Petitioner does not challenge that conviction.

> On September 18, 1998, sometime after 10:00 p.m., George Molina and Arthur and Walter Martinez walked to a residence at 8090 Springdale Court in Gilroy. Molina entered, and Arthur and Walter stood outside. All three were wearing articles of red clothing. Minutes later, defendant, codefendant, and a third man approached Walter and Arthur. Arthur and Valle [Petitioner's codefendant at trial] said "what's up" to each other. Molina came back outside, and at that point, defendants and their friend attacked Molina, Arthur, and Walter. Arthur suffered stab wounds in the stomach, arm, head, and buttocks. Molina was stabbed in the upper chest, stomach, and forearm and suffered a collapsed lung. Walter was stabbed in the chest and later died.
>
> Molina testified that someone the size of Valle attacked him, but he could not see who it was. Arthur testified that he tried to help Molina, but Valle stabbed him and then ran. Arthur chased after him but stopped because he was bleeding and saw a police officer. Neither Arthur nor Molina ever saw a knife, and they did not have knives themselves.

---

[1]The footnotes in the Court of Appeal Opinion are re-numbered.

Elizabeth Centeno, Edelmira Mendoza, Carlos Ybarra, and Tony Zepeda lived at 8090 Springdale Court. They testified that earlier in the day, there had been a fight between the residents of 8090 Springdale, including Ybarra and Alfredo Zepeda, and their neighbors at 8070 Springdale. As a result of that fight, Alfredo was arrested.

Later that night when Mendoza came home, Centeno, Ybarra, and Tony Zepeda told her about the fight and about Alfredo's arrest. A short time later, Molina, Arthur, and Walter arrived. Ybarra then saw defendants and a third person approach the house. Ybarra and Tony also identified defendants. Within moments, Valle attacked Molina. Molina fought back but eventually fell down. Defendants and their friend fled, and Mendoza, Ybarra, and Tony chased them.

As the incident was happening, Officer Nestor Quiones of the Gilroy Police Department was investigating a call from Valle's mother about slashed tires and suspects heading toward Springdale Court. He noticed a pickup truck with slashed tires and a man – Valle's father – standing outside, pointing toward Springdale Court. He then saw Valle running away and detained him. Valle was scared and said people were fighting at the end of the court and that he was chasing people who had been slashing tires. Quiones saw that Valle had been stabbed. Valle kept trying to leave, but Quiones made him sit by the curb.[2] During that time, Quiones observed two young Hispanic males running in front of the houses on Springdale Court. Several other people, including Mendoza, approached and started yelling and challenging Valle. Mendoza told Quiones that Valle had been fighting at her house. Valle said, "'Shut up you stupid bitch. You don't know shit.'" Quiones ordered the others to leave.

On September 19, Officer Steve Baty of the Gilroy Police Department arrested Hernandez. In a taped interview, Hernandez denied participating in the fight on Springdale Court. He said he was with a man named Valentine watching a boxing match on television. At around 8:30 or 9:00 p.m., after the match, Hernandez went home and straight to bed. He said that his mother checked on him at or around 11:00 p.m. that night. His mother woke him the next morning at 9:00 a.m.

Baty went to the house where Hernandez said he had watched the fight. A resident there was unable to identify Hernandez from a photo line-up. Others at the house recalled that Valentine had been there with some friends. Baty tried but was unable to locate Valentine.

Police also interviewed Tony and Ybarra. Tony reported that he recognized all three assailants, one of whom was named Kiki [in the California Court of Appeal's facts section related to the 1997 assault, Petitioner admitted to using "Kiki" as his nickname. Petitioner also admitted to being a member of a Sureño gang]. He said that all three lived near each other on Forest Street. Ybarra also said that one of the men was named Kiki.

Monica Riojas lives at 8091 Springdale Court across from the Zepeta residence. She had dated Hernandez in the past, but at trial testified that she and he were just friends. However, after Hernandez was arrested, she wrote letters to him and, among other things, professed her love.

She testified that she had seen the earlier fight that resulted in Alfredo's arrest. Later that day, she was talking to Hernandez in front of his house, when a

---

[2]Valle moved over to a bush. Police later found a knife with Valle's fingerprints and Molina's blood on it.

3

group of young people walked by, and one yelled "fucking scraps," which is an insult used by Norteños against Sureños. Hernandez wanted to find out who it was, but Riojas persuaded him not to. She said three of those people slashed tires as they made their way toward Springdale Court.[3] Riojas left Hernandez, and as she went home, she saw the same three people go to the Zepeda residence. She paged Hernandez, but he did not respond. A short time later, she saw Valle and two others go to the Zepeda residence. They yelled "what's up" to the three people, and then all six began to fight. After a while, Valle and the two others fled. Twenty minutes later, Hernandez phoned Riojas, and she told him about the fight.

Riojas testified that Hernandez was not one of the other two men with Valle. She said that after she became involved in the case, Valle's family and others threatened her. She also reported that her brother was beaten, and her mother's car was vandalized.

Only Hernandez presented evidence in defense, which was that he was not present during the September 19 incident. Mark Moriyama, a criminalist at the Santa Clara County Crime Lab, examined the scene of the crime and testified that there were many drops of blood on the pavement. Other evidence indicated that many of the drops were the result of the earlier fight there. Given the number of drops, one who would have had to be careful walking around the area in order to avoid stepping on a drop. The shoes Hernandez was wearing when arrested revealed no traces of blood on the soles.

## DISCUSSION

### I.   Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d).

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of the [Supreme] Court's decisions as of the time of the relevant state court decision." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412 (2000); *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003); *Alvarado v. Hill*, 252 F.3d 1066, 1068-69 (9th Cir. 2001). Section

---

[3]Ana Valle called police after seeing some males around her father's truck and hearing its alarm go off. A vandalism report was made. Defendant Valle left the house sometime after Ana saw the men.

4

2254(d)(1) "restricts the source of clearly established law to the [Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412.

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the [Supreme] Court on a question of law or if the state court decides a case differently than the [Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 413. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 412-13.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant [s]tate court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. The objectively unreasonable standard is not a clear error standard. *See Andrade*, 538 U.S. at 63 (rejecting the Ninth Circuit's use of clear error standard in *Van Tran v. Lindsey*, 212 F.3d 1143 (9th Cir. 2000)). After *Andrade*, "[t]he writ may not issue simply because, in our determination, a [s]tate court's application of federal law was erroneous, clearly or otherwise." *Id.* at 75-76. While the 'objectively unreasonable' standard is not self-explanatory, at a minimum "it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them." *Id.* at 75.

A federal habeas court may also grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2). A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). This presumption is not altered by the fact that the finding was made by a state court of appeals, rather than by a state trial court. *See Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *see also Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir. 2001), *amended by* 253 F.3d 1150 (9th Cir. 2001).

Where, as here, the California Supreme Court denies review of Petitioner's claim without

explanation, the Court looks to the last reasoned state court decision in conducting habeas review. *See Shackleford v. Hubbard*, 234 F.3d 1072, 1079 (9th Cir. 2000) (citation omitted), *cert. denied*, 534 U.S. 944 (2001) (the district court "looks through" the unexplained California Supreme Court decision to the last reasoned state court decision). In the instant case, the California Court of Appeal rendered the last reasoned state court decision.

Habeas relief is warranted only if the constitutional error at issue is structural error or had a "substantial and injurious effect or influence in determining the jury's verdict." *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)). Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in "actual" prejudice. *Brecht*, 507 U.S. at 637.

## II. Legal Claims

### A. Insufficiency of the Evidence

Petitioner asserts that the evidence used to convict him was insufficient and violated his constitutional right to due process. Pet. at 14.

#### 1. Applicable Federal Law

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).[4] A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *see id.* at 324; *see, e.g., Wigglesworth v. Oregon*, 49 F.3d 578, 582 (9th Cir. 1995); *Martineau v. Angelone*, 25 F.3d 734, 739-43 (9th Cir. 1994).

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d

---

[4]*Cf. Fiore v. White*, 531 U.S. 225, 228-29 (2001) (due process violated where basic element of crime not proven because statute did not prohibit defendant's conduct).

6

1  335, 338 (9th Cir. 1992), *cert. denied*, 510 US 843 (1993).  The federal court "determines only
2  whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier
3  of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *See id.*
4  (quoting *Jackson*, 443 U.S. at 319).  Only if no rational trier of fact could have found proof of guilt
5  beyond a reasonable doubt, may the writ be granted.  *See Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d
6  at 338; *Miller v. Stagner*, 757 F.2d 988, 992-93 (9th Cir.), *amended*, 768 F.2d 1090 (9th Cir. 1985),
7  *cert. denied*, 475 U.S. 1048, *and cert. denied*, 475 U.S. 1049 (1986); *Bashor v. Risley*, 730 F.2d
8  1228, 1239 (9th Cir.), *cert. denied*, 469 U.S. 838 (1984).

9      If confronted by a record that supports conflicting inferences, a federal habeas court "must
10 presume – even if it does not affirmatively appear on the record – that the trier of fact resolved any
11 such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at
12 326.  A jury's credibility determinations are therefore entitled to near-total deference.  *Bruce v.*
13 *Terhune*, 376 F.3d 950, 957 (9th Cir. 2004).  Only in the most exceptional of circumstances does
14 *Jackson* permit a federal habeas court to revisit credibility determinations.  *See id.* at 957; *People of*
15 *the Territory of Guam v. McGravey*, 14 F.3d 1344, 1346-47 (9th Cir. 1994).

16     The Ninth Circuit has expressly left open the question of whether 28 U.S.C. § 2254(d)
17 requires an additional degree of deference to a state court's resolution of sufficiency of the evidence
18 claims.  *See Chein v. Shumsky*, 373 F.3d 978, 982-83 (9th Cir.2004) (en banc); *Bruce*, 376 F.3d at
19 956-57.  However, five other circuits have concluded that a sufficiency of the evidence claim
20 presents a legal determination that must be evaluated through the AEDPA standard of review
21 embodied in § 2254(d)(1), and no circuit has explicitly held that a state court's *Jackson* inquiry is
22 exempt form AEDPA's standard of review.  *Id.* at 958-59 (O'Scannlain, J., concurring specially).

23     **2.**    **Analysis**

24     Petitioner asserts that the evidence used to convict him of murder by aiding and abetting was
25 insufficient and violated his due process rights. Pet. at 14.  Specifically, Petitioner contends that no
26 evidence exists to show that he was aware that his codefendant and friend had brought knives to the
27 fight until after the fatal stabbings had occurred. Traverse at 4. Petitioner points out that the fight
28 was brief and that no one spoke during the fight. *Id.*

Petitioner relies on *United States v. Andrews*, 75 F.3d 552 (9th Cir. 1996) to show that there is insufficient evidence to sustain his conviction. In *Andrews*, the two codefendants, a brother and a sister, intentionally returned to the scene of a previous fight to "get" the person who had fought the sister earlier. *Id.* at 554. Upon finding their target's car, the brother got out of their truck and shot their intended target. *Id.* However, the sister then jumped out of the truck and fired indiscriminately into the other car, killing one passenger and wounding two others. *Id.* The Ninth Circuit reversed the brother's convictions for the second murder and the two attempted manslaughters because he did not intend to hurt anyone beside the person he actually killed. *Id.* at 556-57.

Petitioner's actions, however, are not like the brother's in *Andrews*. Petitioner and his associates walked up to Springdale Court together and started the fight with Wally, Arthur, and Molina as a group, whereas the attacks in *Andrews* were staggered at two distinct points in time. While the brother in *Andrews* did not know or share in his sister's motives for the latter homicides, the jury could reasonably have inferred that Petitioner did know and share the other two attackers' motives here. As the California Court of Appeal noted, the evidence revealed that Wally, Arthur, and Molina walked past Petitioner, hurled a gang insult at him and slashed the codefendant's father's tires. Respondent's Ex. 3 at 7. Given the additional evidence that Petitioner was a Sureño and that the three victims were members of a rival gang, the jury could reasonably have found that Petitioner and his confederates intended to violently retaliate against all three victims as payback for the slights and vandalism. *Id.* at 2-3. Under those circumstances, a reasonable jury could have inferred from the evidence that the three attackers knew that two of them had knives and intended to use them in a potentially lethal way and that Petitioner knowingly aided and abetted them in their homicidal retaliation.

Petitioner also relies on *Martinez v. Borg*, 937 F.2d 422 (9th Cir. 1991). In *Martinez*, the petitioner showed that while he had supplied his codefendant with a gun to aid in a robbery, he did not intend to aid the codefendant in shooting a police officer when they were pulled over after the robbery. *Id.* at 425. The present case is again distinguishable. Here, Petitioner willingly helped assault the three victims and murder Wally, whereas in *Martinez*, the petitioner agreed to aid in the robbery but in no way agreed to, or aided in, the later shooting of the police officer.

8

The state court similarly distinguished the above cases and also reevaluated the sufficiency of the evidence. Respondent's Ex. 3 at 7-8. Based on the underlying gang activity and facts of the case, the California Court of Appeal concluded that the jury could have reasonably inferred that the codefendants and their friend intended to violently retaliate against Wally, Arthur, and Molina. *Id.*

Accordingly, given the high level of deference accorded state court decisions and this Court's agreement that the evidence was sufficient to convict, the Court finds that Petitioner has failed to demonstrate that the evidence was insufficient to allow any rational trier of fact to find guilt beyond a reasonable doubt, *see Jackson*, 443 U.S. at 326, and his request for habeas relief on this ground is DENIED.

### B.     Instructional Error Caused By Not Reading CALJIC 3.02

Petitioner also asserts that the trial judge erred in not reading CALJIC No. 3.02 (defining the doctrine of natural and probable consequences of the target offense that the Defendant aided and abetted). Pet. at 18.

#### 1.     Applicable Federal Law

A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceeding. *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988). The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment. *See id.* Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury. *See Duckett*, 67 F.3d at 745.

An examination of the record is required to see precisely what was given and what was refused and whether the given instructions adequately embodied the defendant's theory. *See United States v. Tsinnijinnie*, 601 F.2d 1035, 1040 (9th Cir. 1979), *cert. denied*, 445 U.S. 966 (1980). In other words, it allows a determination of whether what was given was so prejudicial as to infect the entire trial and so deny due process. *See id*.

The omission of an instruction is less likely to be prejudicial than a misstatement of the law. *See Walker v. Endell*, 850 F.2d 470, 475-76 (citing *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting

1  *Kibbe*, 431 U.S. at 155). The significance of the omission of such an instruction may be evaluated
2  by comparison with the instructions that were given. *Murtishaw v. Woodford*, 255 F.3d 926, 971
3  (9th Cir. 2001) (quoting *Henderson*, 431 U.S. at 156); *see id.* at 972 (due process violation found in
4  capital case where petitioner demonstrated that application of the wrong statute at his sentencing
5  infected the proceeding with the jury's potential confusion regarding its discretion to impose a life or
6  death sentence).

### 2. Analysis

The jury convicted Petitioner of aiding and abetting second degree murder. The trial judge instructed the jury on aiding and abetting using CALJIC Nos. 3.00 (defining the principals) and 3.01 (defining the elements of aiding and abetting); however, the trial judge did not read CALJIC 3.02 (defining the extension of aiding and abetting liability for a higher crime to the natural and probable consequences of the principal's actions) to the jury. Petitioner asserts that not reading CALJIC 3.02 prevented him from receiving a fair trial.

If the jury had convicted Petitioner of second degree murder arising solely from the natural and probable consequences of aiding and abetting assault with a deadly weapon, then the trial court would have erred by not reading CALJIC 3.02. *People v. Prettyman*, 14 Cal. 4th 248 (1996). However, such error could not merit granting relief because the jury found Petitioner guilty under a different, and stricter, theory of culpability – aiding and abetting second degree murder directly.

The trial judge instructed the jury on second degree murder with implied malice. RT at 1388. The prosecution's closing argument emphasized that Petitioner aided and abetted second degree murder. RT at 1425. Despite the fact that a theory of second degree murder liability arising from the natural and probable consequences of aiding and abetting assault with a deadly weapon did not require a finding of malice by Defendant, the prosecution never asked for the natural and probable consequences instruction. Instead, the prosecution repeatedly urged the jury to find Petitioner guilty of directly aiding and abetting second degree murder. RT at 1588. Because the jury found Petitioner guilty of directly aiding and abetting second degree murder with implied malice, and not the standard of second degree murder arising from the natural and probable consequences of aiding and abetting assault with a deadly weapon, the failure to read CALJIC 3.02 did not deprive him of a

1  fair trial. Accordingly, Petitioner's request for habeas relief on this ground is DENIED.

2      **C.      Erroneous Reading of CALJIC 8.51 on Felony Murder**

3      Petitioner lastly asserts that the trial judge erred by reading CALJIC 8.51, an instruction on

4  felony murder, which allowed the jury to convict Petitioner of second degree murder without a

5  finding of malice. Pet. at 23-27. Petitioner argues that such an instruction is clearly erroneous

6  because an assault with a deadly weapon that causes the homicide cannot serve as the basis for a

7  second degree felony murder conviction. *People v. Ireland*, 70 Cal. 2d 522, 538-40 (1969).

8           **1.      Applicable Federal Law**

9      A challenge to a jury instruction solely as an error under state law does not state a claim

10 cognizable in federal habeas corpus proceedings. *See Estelle v. McGuire*, 502 U.S. 62, 71-72

11 (1991). Nor does the fact that a jury instruction was inadequate by Ninth Circuit direct appeal

12 standards mean that a petitioner who relies on such an inadequacy will be entitled to habeas corpus

13 relief from a state court conviction. *See Duckett v. Godinez*, 67 F.3d 734, 744 (9th Cir. 1995) (citing

14 *Estelle*, 502 U.S. at 71-72), *cert. denied*, 517 U.S. 1158 (1996).

15     To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the

16 ailing instruction by itself so infected the entire trial that the resulting conviction violates due

17 process. *See Estelle*, 502 U.S. at 72. The instruction may not be judged in artificial isolation, but

18 must be considered in the context of the instructions as a whole and the trial record. *Id*. In other

19 words, the court must evaluate jury instructions in the context of the overall charge to the jury as a

20 component of the entire trial process and decide whether there is a reasonable likelihood the jury

21 applied the erroneous instruction in violation of the Constitution. *Id.* at 72-73; *see e.g., Middleton v.*

22 *McNeil*, 124 S. Ct. 1830, 1831-32 (2004) (per curiam) (no reasonable likelihood that jury misled by

23 single contrary instruction on imperfect self-defense defining "imminent peril" where three other

24 instructions correctly stated the law).

25     Finally, the defined category of infractions that violate fundamental fairness is very narrow:

26 "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has

27 limited operation." *Estelle*, 502 U.S. at 73.

28          **2.      Analysis**

     The judge erroneously read CALJIC 8.51, an instruction on felony murder, that could have

provided an improper basis for Petitioner's second degree murder conviction. RT at 1395. However, an erroneous jury instruction only merits granting a writ of habeas corpus if there is a reasonable likelihood that the jurors would misunderstand the instruction to the Petitioner's detriment. *Estelle*, 502 U.S. at 72.

In the case at hand, the jurors could have found Petitioner guilty of murder in the second degree in two ways: legitimately, by finding that Petitioner aided and abetted an implied malice homicide, or illegitimately, by relying on the felony murder doctrine and convicting without a finding of malice. The issue before this Court is therefore whether or not there is a reasonable likelihood the jury convicted Petitioner without a finding of malice.

The trial court did not read the other standard jury instructions explaining the felony murder rule (CALJIC 8.21, 8.32). Throughout the jury instructions, the trial judge emphasized that a murder conviction requires malice. RT at 1388, 90. Prior to reading the erroneous instruction that dictated that deaths resulting from a felony are murder and deaths resulting from a misdemeanor are involuntary manslaughter (RT at 1395), the trial judge emphasized that murder and manslaughter are separated by a finding of malice. *Id.* at 1390. No party objected to the felony murder instruction when it was read or after the verdict.

The prosecution's closing argument began with a clarification of the jury instructions. *Id.* at 1413-35. In the argument, the prosecution further emphasized that a murder conviction requires finding malice aforethought. *Id.* at 1420. The prosecution actually started the trial by writing out the word "malice" for the jury and reminding them of it in closing arguments. *Id.* at 1424. "Malice... that would be a key instruction which you'll get a chance to look at, and that's required for murder." *Id.* After explaining the first-degree murder instructions, the prosecution walked through the instruction on implied malice for second degree murder and how the prosecution believed it applied to the facts of the case. *Id.* at 1425. Later, the prosecution reiterated to the jury "the second choice you have is that it's second-degree murder, which is simply a killing with malice." *Id.* at 1430. The prosecution then discussed the manslaughter instructions and how they relate to malice. *Id.* at 1431-32. At no point in the closing argument did the prosecution raise the felony murder instruction.

The defense counsel made similar points in his arguments. "Second degree just requires

malice aforethought, malice aforethought." *Id.* at 1473 (repetition in original). Nor did they ever mention the felony murder instruction.

The Supreme Court's holding and discussion in *Middleton* is particularly relevant to these facts. In *Middleton*, the jury received one incorrect instruction and three correct instructions regarding second degree murder. 541 U.S. at 435-36. The Supreme Court reversed the Ninth Circuit and upheld the California Court of Appeal when it found that there was no reasonable likelihood the jury applied the wrong rule. *Id.* at 438. The Supreme Court also cautioned that the value of the prosecution's closing arguments in clarifying the jury instructions was not to be discounted . *Id.* Where the jury instructions were ambiguous because they were internally inconsistent, the Court held that assuming the closing arguments cleared up the inconsistencies was reasonable especially where the prosecution resolved the ambiguity in the defense's favor. *Id.*

The jury instructions in the instant case also became ambiguous because of one erroneous instruction. As in *Middleton*, the prosecution exclusively favored one interpretation of the instructions; an interpretation which favored the defendants by emphasizing that the jury must find malice to convict on second-degree murder. The repeated emphasis of the malice requirement and the clarity with which the requirement was stated by both parties demonstrates that there is no reasonable likelihood that the jury found Petitioner guilty of second degree murder without finding implied malice as well.

Accordingly, Petitioner's request for habeas relief on this ground is DENIED.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. The Clerk of the Court shall enter judgment and close the file.

IT IS SO ORDERED.

DATED:8/9/05

_____
SAUNDRA BROWN ARMSTRONG
United States District Judge